UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHANGPENG ZHAO, aka "CZ,"<br><br>Defendant. | NO. CR23-179 JHC<br><br>INFORMATION |

The United States charges that:

### COUNT 1

**(Failure to Maintain an Effective Anti-Money Laundering Program)**

**A.   Overview**

1.   Starting at least as early as August 2017 and continuing to at least October 2022, Defendant CHANGPENG ZHAO violated the Bank Secrecy Act ("BSA") by willfully causing Binance Holdings Limited ("Binance" or "the Company") to fail to implement and maintain an effective anti-money laundering ("AML") program. ZHAO prioritized Binance's growth, market share, and profits over compliance with the BSA. Binance facilitated billions of dollars of cryptocurrency transactions on behalf of its customers without implementing appropriate "know your customer" ("KYC") procedures or conducting adequate transaction monitoring. As a result of ZHAO's willful failure to

Information - 1
*United States v. Zhao*, USAO#2019R00100

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

implement an effective AML program, Binance processed transactions involving proceeds of illegal activity and caused transactions between U.S. persons and persons in jurisdictions that are subject to comprehensive U.S. sanctions.

**B.   Relevant Entities and Individuals**

2.   Binance was an entity registered in the Cayman Islands and held, *inter alia*, the employment contracts for certain employees operating Binance.com.

3.   Defendant CHANGPENG ZHAO ("ZHAO"), also known as "CZ," was Binance's primary founder, majority owner, and chief executive officer ("CEO"). ZHAO founded Binance in or around 2017. Together with a core senior management group, ZHAO, as Binance's CEO, made the strategic decisions for Binance and exercised day-to-day control over its operations and finances.

4.   Binance.com was launched in or around July 2017 and became a virtual currency exchange through which millions of users in more than 180 countries bought and sold hundreds of types of virtual assets, in volumes equivalent to trillions of U.S. dollars.

5.   Individual 1, whose identity is known to the United States and the Defendant was Binance's chief compliance officer during much of the relevant period. Individual 1 was hired by Binance in April 2018. Binance placed him on administrative leave beginning in or around June 2022. Individual 1's responsibilities included building and directing the compliance protocols and functions for Binance and certain affiliated exchanges offering, among other things, conversion between virtual and fiat currencies.

6.   A cloud computing platform and application programming interface service owned by a technology service provider based in the Western District of Washington hosted Binance's website, https://www.binance.com, stored Binance's data, and operated Binance's exchange on servers in Japan.

**C.   The Bank Secrecy Act**

7.   During the relevant period, Binance was a foreign-located cryptocurrency exchange that did business wholly or in substantial part within the United States, including

Information - 2
*United States v. Zhao*, USAO#2019R00100

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

by providing services to a substantial number of U.S. customers. As a result, under U.S. law, Binance was a money transmitter, which is a type of money services business ("MSB"). 31 C.F.R. § 1010.100(ff). As a cryptocurrency exchange, Binance was a money transmitter because it was "[a] person that provides money transmission services," meaning "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means," including through "an electronic funds transfer network" or "an informal value transfer system." *Id.*

8. Money transmitters were required to comply with the BSA, 31 U.S.C. § 5311 *et seq.*, for example by filing reports of suspicious transactions that occurred in the U.S., 31 U.S.C. § 5318(g), 31 C.F.R. § 1022.320(a), and implementing an effective AML program "that [was] reasonably designed to prevent the money services business from being used to facilitate money laundering and the financing of terrorist activities," 31 C.F.R. § 1022.210. An AML program was required, at a minimum and within 90 days of the business's establishment, to "[i]ncorporate policies, procedures, and internal controls reasonably designed to assure compliance" with requirements that an MSB file reports, create and retain records, respond to law enforcement requests, and verify customer identification—commonly called a "KYC" requirement. 31 C.F.R. §§ 1022.210(d)(1), (e).

**D.   Binance**

9. ZHAO founded Binance in June 2017 and, as its CEO, exercised day-to-day control over its operations. Binance.com was an online exchange through which millions of customers around the world bought and sold hundreds of virtual assets. Binance had U.S. customers and tracked the exchange's progress in securing new customers from various geographies, including the United States. Between around June 2017 and October 2022, more than a million U.S. retail users conducted more than 20 million deposit and withdrawal transactions worth $65 billion. These users conducted more than 900 million spot trades worth more than $550 billion. Over this same period, Binance relied on U.S.

Information - 3
*United States v. Zhao*, USAO#2019R00100

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

trading firms to make markets on the exchange and provide needed liquidity, thereby making various digital assets available to trade by other customers at competitive prices. This helped Binance grow into the largest cryptocurrency exchange in the world. ZHAO understood that because Binance served a substantial number of U.S. users, it was required to register with the U.S. Department of the Treasury Financial Crimes Enforcement Network ("FinCEN") as an MSB and therefore required under the BSA to implement an effective AML program. Nonetheless, Binance did not register with FinCEN as an MSB at any time or implement an effective AML program in the relevant period.

10. ZHAO prioritized Binance's growth and profits over compliance with U.S. law, telling Binance employees that it was "better to ask for forgiveness than permission" in what he described as a "grey zone." ZHAO knew that U.S. users were essential for Binance to grow, were a significant source of revenue, and had a substantial network effect. As more customers conducted transactions on Binance, the exchange became increasingly attractive to other customers, generating additional revenue for Binance. ZHAO sought those benefits for the Company while disregarding the legal obligation to implement an effective AML program.

**E.   Zhao Willfully Violated the BSA by Causing Binance to Have an Ineffective AML Program**

11. During the relevant period, ZHAO willfully violated the BSA by causing Binance to fail to implement and maintain an effective AML program. In particular, Binance failed to collect or verify KYC information from a large share of its users, including users in the Western District of Washington; failed to systematically monitor transactions; and failed to file suspicious activity reports ("SARs") with FinCEN as required by the BSA.

12. ZHAO believed that requiring all customers to provide KYC information would mean that some customers would choose not to use Binance and others would be rejected by the compliance process—both of which would interfere with Binance gaining

Information - 4
*United States v. Zhao*, USAO#2019R00100

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

market share. As a result, before August 2021, Binance allowed a significant portion of its customers to create accounts and trade on the exchange without providing identifying information.

13. For example, from Binance's inception in 2017 until about August 2021, a Binance user could open an account known as a "Level 1" or "Tier 1" account by simply providing an email address and password; Binance required no other information, such as the user's name, citizenship, residential address, or government identification.

14. Once the Level 1 account was active, the user could deposit and trade an unlimited amount of virtual currency. Although a Level 1 account user could withdraw value up to only 2 Bitcoin ("BTC") per day, a user could evade the withdrawal limit by opening multiple Level 1 accounts using different email addresses. And for most of Binance's existence, even if a user adhered to the withdrawal limit on a single account, the user could still withdraw thousands—and sometimes tens of thousands—of dollars in total value of cryptocurrency per day.

15. For example, on December 15, 2018, at about its lowest value during Binance's existence, 2 BTC were worth $6,279.70. On April 15, 2021, at around Bitcoin's highest value during the period that Binance offered Level 1 accounts, 2 BTC were worth about $127,411.60.

16. On certain occasions, Binance identified users who appeared to be involved in illicit activity but allowed the users to continue to use the exchange because they were "VIPs," advising them to avoid transferring funds from sources that Binance identified as high risk.

17. In 2019, Binance amended its Terms of Use to prohibit users from opening multiple active accounts. However, for any accounts opened before August 2021, Binance did not have effective KYC controls in place to enforce the Terms of Use.

Information - 5
United States v. Zhao, USAO#2019R00100

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

18. Binance's AML program did not systematically monitor transactions, as required by the BSA and its implementing regulations. And while Binance developed an internal process for flagging suspicious activity, Binance never filed a SAR with FinCEN.

19. Because Binance, during the relevant period, did not require all users to complete KYC and did not have procedures to systematically monitor transactions and report suspicious activity, Binance lacked effective controls to prevent it from processing transactions involving proceeds of illicit activity on behalf of its customers.

20. ZHAO understood that U.S. law prohibits U.S. persons from conducting certain financial transactions with countries, persons, or entities sanctioned by the U.S. government. ZHAO knew that both U.S. users and users in comprehensively sanctioned jurisdictions were on the Binance exchange. Binance employees, including Individual 1, specifically warned ZHAO that there were users from sanctioned countries on Binance's exchange and about the U.S. legal risks associated with transactions involving such customers. Individual 1 once wrote to ZHAO that it was Individual 1's "duty to constantly remind" ZHAO and others of this risk. On another occasion, in a chat thread that included ZHAO, a Binance employee informed senior Binance officials that the chief financial officer of another company had been arrested for sanctions violations and warned that this could happen to Binance.

21. ZHAO knew a BSA-compliant, effective AML program with appropriate KYC and transaction monitoring procedures was important to detect, prevent, and report criminal activity at financial institutions and that effective AML compliance programs with appropriate KYC procedures could make it possible to block transactions between U.S. users and users from comprehensively sanctioned jurisdictions, as well as individuals and entities that are sanctioned under programs that are not country-specific, *i.e.*, specially designated nationals ("SDNs").

22. For example, Individual 1 told ZHAO and other senior Binance employees that it was imperative to block trades by users who were logged in using an internet protocol

Information - 6
*United States v. Zhao*, USAO#2019R00100

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

("IP") address associated with a comprehensively sanctioned jurisdiction, even if those users had provided KYC documents from a non-sanctioned country. He noted that both "IP + KYC" are factors for sanctions. Later in the chat, Individual 1 wrote: "Iran, North Korea, Syria, Cuba and Crimea . . . . ***They present the highest risk in [the U.S. Department of the Treasury Office of Foreign Assets Control ("OFAC")]***."

23. ZHAO nonetheless did not direct Binance to implement controls, including appropriate KYC, that would have prevented Binance from matching U.S. users with users subject to U.S. sanctions to conduct cryptocurrency transactions. As a result, Binance would continue to allow a customer to trade on the exchange using an IP address from a comprehensively sanctioned jurisdiction if that user had submitted KYC documents from a non-sanctioned jurisdiction. It was reasonably foreseeable to ZHAO and others that Binance's matching engine—the tool that matched customer bids and offers to execute cryptocurrency trades—would match U.S. users with counterparties in comprehensively sanctioned jurisdictions. Indeed, without an effective AML program and controls, Binance caused transactions between these U.S. users and users in comprehensively sanctioned jurisdictions. These transactions were a clear and foreseeable result of ZHAO's decision to prioritize profit and growth over compliance with the BSA.

24. Under ZHAO's direction, Binance permitted any customer to use its exchange without completing KYC until August 2021. In August 2021, Binance publicly announced it would require all users to undergo full KYC. Even after that announcement, however, the Company allowed a considerable share of Binance's customers to use Binance without KYC until May 2022. Moreover, until at least October 2022, Binance allowed users to trade on the exchange through third-party "brokers" without submitting any KYC information to Binance.

25. Between August 2017 and October 2022, Binance caused, according to its own data, at least $890 million in transactions between U.S. users and users Binance identified as Iranians; and millions more in transactions between U.S. users and users in

Information - 7
United States v. Zhao, USAO#2019R00100

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

other comprehensively sanctioned jurisdictions, including Cuba, Syria, and the Ukrainian regions of Crimea, Donetsk, and Luhansk.

//

26. Defendant and Binance prioritized Binance's growth over compliance with the BSA. As a result, Binance earned significant fees from U.S. customers without implementing an effective risk-based AML program that would protect customers, the U.S. financial system, and Binance from transactions involving illicit funds. In particular, Binance earned significant fees on transactions between U.S. customers and customers in comprehensively sanctioned jurisdictions.

### F. Willful Violation of the Bank Secrecy Act

27. From at least August 2017, and continuing until at least October 2022, in the Western District of Washington, at King County and elsewhere, Defendant ZHAO a/k/a "CZ" willfully violated and caused a financial institution, to wit, Binance.com, to violate the Bank Secrecy Act, in violation of Sections 5318(h), 5322(b), 5322(c), and 5322(e) of Title 31, United States Code, as well as regulations prescribed thereunder, including Section 1022.210 of Title 31, Code of Federal Regulations, to wit, the Defendant failed and caused Binance.com to fail to establish, develop, implement, and maintain an effective anti-money laundering program that was reasonably designed to prevent the money services business from being used to facilitate money laundering and the financing of terrorist activities and that was commensurate with the risks posed by the location and size of, and nature and volume of the services provided, by the money services business, and such violation occurred while violating another law of the United States, to wit, Sections 1960(a) and 1960(b)(1)(B) of Title 18, United States Code and Section 1705 of Title 50, United States Code and as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period.

//

//

Information - 8
*United States v. Zhao*, USAO#2019R00100

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

All in violation of Title 31, United States Code, Sections 5318(h), 5322(b), 5322(c), and 5322(e); Title 18, United States Code, Section 2; and Title 31, Code of Federal Regulations, Section 1022.210.

DATED this 14th day of November, 2023.

/s/
TESSA M. GORMAN
Acting United States Attorney

/s/
MARGARET A. MOESER
Acting Chief
Money Laundering and Asset Recovery Section
Criminal Division, U.S. Department of Justice

/s/
JENNIFER KENNEDY GELLIE
Acting Chief
Counterintelligence and Export Control Section
National Security Division, U.S. Department of Justice

Information - 9
*United States v. Zhao*, USAO#2019R00100

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970